1 F.3d 1242
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
C. Kenneth STILL, Plaintiff-Appellant,
v.
FRUEHAUF CORP., Defendant-Appellee.
 No. 92-5848.
 United States Court of Appeals, Sixth Circuit.
 July 13, 1993.
 
 Before KEITH and NELSON, Circuit Judges; CELEBREZZE, Senior Circuit Judge.
 PER CURIAM:
 
 
 1
 Plaintiff-Appellant, C. Kenneth Still ("Still"), appeals the district court's order affirming, in part, the bankruptcy court's denial of his claim to recover lease payments as preferential transfers under 11 U.S.C. Sec. 547(b) of the Bankruptcy Code. For the reasons stated below, we AFFIRM in part and REVERSE in part the decision of the district court.
 
 I.
 
 2
 This case involves a claim originally filed by C. Kenneth Still, as trustee for Southwest Equipment Rental, Inc. ("Southwest"), against Fruehauf Corporation ("Fruehauf") for the return of forty lease payments made by Southwest to Fruehauf. Still claimed that the payments in question were recoverable as preferential transfers under 11 U.S.C. Sec. 547(b). Fruehauf denied that the payments were preferential transfers, but claimed that the payments were made in the ordinary course of business and, therefore, exempt from preference avoidance under 11 U.S.C. Sec. 547(c)(2).
 
 
 3
 The relevant facts of this case are not in dispute and are adequately summarized in both the bankruptcy court's memorandum decision and the district court's order. The history of lease payments made by Southwest to Fruehauf during the relevant time period is set forth in the bankruptcy court's memorandum decision. (See Bankruptcy Court Memorandum at 22-23, 25-26).
 
 
 4
 The case was heard on December 4 and 5, 1990, by the Bankruptcy Court for the Eastern District of Tennessee, Southern Division. The bankruptcy court issued a memorandum decision on March 6, 1991, instructing the parties to submit a judgment to the court in accordance with the court's memorandum decision. On March 27, 1991, a judgment was entered against Fruehauf for an obligation of $168,135.49 plus $16,873.53 interest. On appeal, the district court issued an order on May 12, 1992, affirming all of the findings and rulings of the bankruptcy court, except its determination of which lease payments were preferential transfers under Sec. 547(b). The district court held that only three payments were preferential transfers recoverable by Southwest from Fruehauf. The district court's decision resulted in an amendment of the original judgment entered by the bankruptcy court. The district court entered an amended judgment against Fruehauf for $8,995.72. Still appeals the district court's decision, raising several challenges to the findings and rulings contained in the court's order. These challenges are discussed seriatim below.
 
 II.
 
 5
 Still contends that the district court erred in its finding that only three payments made by Southwest to Fruehauf were not within the ordinary course of business under Sec. 547(c)(2). Both parties agree that from January through June of 1987, Southwest made 40 lease payments to Fruehauf. Still contends that all 40 payments were preferential transfers. Fruehauf, however, claims that the district court was correct in ruling that only three of the 40 payments were preferential transfers under Sec. 547(b). Section 547(b) provides that a trustee may avoid any transfer of property of the debtor:
 
 
 6
 (1) to or for the benefit of a creditor;
 
 
 7
 (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
 
 
 8
 (3) made while the debtor was insolvent;
 
 
 9
 (4) made--
 
 
 10
 (A) on or within 90 days before the date of the filing of the petition; or
 
 
 11
 (B) between 90 days and one year before the date of the filing of the petition, if such creditor, at the time of such transfer--
 
 
 12
 (i) was an insider; and
 
 
 13
 (ii) had reasonable cause to believe the debtor was insolvent at the time of such transfer; and
 
 
 14
 (5) that enables such creditor to receive more than such creditor would receive if--
 
 
 15
 (A) the case were a case under chapter 7 of this title;
 
 
 16
 (B) the transfer had not been made; and
 
 
 17
 (C) such creditor received payment of such debt to the extent provided by the provisions of this title.
 
 
 18
 11 U.S.C. Sec. 547(b) (West 1979) (emphasis added).
 
 
 19
 The bankruptcy court found that Still proved all the elements of Sec. 547(b) with respect to the 40 payments or transfers made to Fruehauf. The court explained its findings as follows:
 
 
 20
 Except for six interest payments, there appears to be no disagreement that Sec. 547(b)(2) has been satisfied in that the lease payments--all late--were for or on account of an antecedent debt owed by the debtor before such transfer was made. Likewise, the plaintiff has satisfied Sec. 547(b)(1) and Sec. 547(b)(4) of the preference elements since all payments made by Southwest to Fruehauf within the one-year period benefitted Thiele, an insider guarantor of the lease obligations.
 
 
 21
 Section 547(b)(3) requires that in order for a transfer to be preferential it must be made while the debtor is insolvent.... The evidence established that at the time the transfers were made, the debtor was insolvent.
 
 
 22
 Section 547(b)(5) requires that in order for a transfer to be preferential it must enable a creditor to receive more than the creditor would have received in a chapter 7 liquidation and the disputed transfer had not been made. William Thiele received no security interest for his personal guarantee of the lease and Fruehauf is undersecured in an amount exceeding the transfers at issue. There will not be sufficient funds in the estate to pay unsecured creditors. Therefore, each of the lease payments at issue reduced Thiele's potential liability to Fruehauf under the guarantee, and enabled Thiele to receive more than he would have received in a chapter 7 liquidation if the payments had not been made.
 
 
 23
 (Bankruptcy Court Memorandum at 11-12) (citations and footnotes omitted).
 
 
 24
 After concluding that Still had successfully proven that the payments at issue were all preferential transfers under Sec. 547(b), the bankruptcy court then considered Sec. 547(c)(2), which provides a defense to the avoidance of preferential transfers. Section 547(c)(2) reads as follows:
 
 
 25
 (c) The trustee may not avoid under this section a transfer--
 
 
 26
 (2) to the extent that such transfer was
 
 
 27
 (A) in payment of a debt incurred in the ordinary course of business or financial affairs of the debtor and the transferee;
 
 
 28
 (B) made not later than 45 days after such debt was incurred;
 
 
 29
 (C) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
 
 
 30
 (D) made according to ordinary business terms;
 
 
 31
 11 U.S.C. Sec. 547(c)(2) (West 1979) (emphasis added). The bankruptcy court made the following findings regarding the timeliness of the payments made by Southwest to Fruehauf:
 
 
 32
 In the instant case, the majority of the lease payments during the preference period were over 31 days late. Although Fruehauf contends these late payments were made within the ordinary course of business, the evidence at trial showed that sometime prior to March 25, 1987 Fruehauf began to pressure Southwest to make timely payments. Fruehauf notified Southwest it expected the payments due through April, 1987 to be made by April 25th, the May payments to be made by May 15, the June payments to be made by June 7, and the July payments to be on time. The April payments were all made prior to April 25, 1987.
 
 
 33
 Not only were the majority of the lease payments made later during the preferential period than previously, but 17 checks were issued to replace checks returned for insufficient funds and another five checks never cleared the bank.
 
 
 34
 (Bankruptcy Court Memorandum at 24-25). In deciding which payments to Fruehauf were made within the ordinary course of business, the bankruptcy court examined trucking industry practices, stating:
 
 
 35
 The proof at trial also demonstrated that while it is ordinary in the trucking industry for common carrier accounts to run one to 30 days past due, it is not ordinary for these accounts to run between 30 and 60 days past due. In fact, the defendant's expert, John Morrow, testified he became involved with the Southwest account because of the seriousness of its delinquency.
 
 
 36
 The court concludes the lease payments made within the preference period which were over 30 days late or which were made by checks returned for insufficient funds were not made according to the ordinary course of business of Southwest and Fruehauf or according to ordinary business terms. Those payments made 30 days late or less were made consistent with the parties' prior course of dealings and according to ordinary business terms and, thus, fall within the Sec. 547(c)(2) exception.
 
 
 37
 (Bankruptcy Court Memorandum at 26) (footnote omitted).
 
 
 38
 The district court overruled the bankruptcy court's determination that payments made to Fruehauf by Southwest more than 30 days late were outside the ordinary course of business. The district court concluded that only three payments were made to Fruehauf outside the ordinary course of business. The court explained its ruling as follows:
 
 
 39
 There is nothing in the facts of this case which suggests that an examination of industry practices was warranted. See In re Yurika Foods Corp., at 45. Without that testimony, there is very little reason to select a 30-day period to determine which payments fall outside the protection of the "ordinary course of business" defense. In addition, there is no evidence that Fruehauf made any effort to declare the lease in default or protect its position vis-a-vis other creditors before March of 1987, when Fruehauf first began to pressure Southwest to make more timely payments. When the Court focusses [sic] entirely on the payment pattern established between the parties, three payments made in April of 1987 stand out from all the rest by being only 4, 5, and 8 days overdue. It is only these three remarkably prompt payments which contrast with the gradually more delinquent pattern of business dealings between the parties and suggest that, by that time, Fruehauf was indeed changing its collection practice to better its position.
 
 
 40
 (District Court Order at 12). Fruehauf contends that the district court's ruling is supported by In re Yurika Foods Corp., 888 F.2d 42 (6th Cir.1989), and In re Fulghum, 872 F.2d 739 (6th Cir.1989). Still, however, submits that the bankruptcy court's consideration of industry practices is supported by this Circuit's recent decision in Logan v. Basic Distribution Corp. (In re Fred Hawes Organization, Inc.), 957 F.2d 239 (6th Cir.1992). There is a dispute between Still and Fruehauf regarding the Logan Court's consideration of industry practices under Sec. 547(c)(2)(C). Fruehauf argues that Logan departs from this Court's earlier decisions in Yurika and Fulghum, while Still argues that Logan is consistent with Yurika and Fulghum.
 
 
 41
 We do not read Logan as departing from this Court's decisions in Yurika and Fulghum. Under Sec. 547(c)(2)(B) and (C), as the Logan Court noted, a trustee in bankruptcy may not avoid a preferential transfer to the extent that the transfer is shown to have been:
 
 
 42
 (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;
 
 
 43
 (B) made in the ordinary course of business ... of the debtor and the transferee; and
 
 
 44
 (C) made according to ordinary business terms.
 
 
 45
 Logan, 957 F.2d at 243 (emphasis in original).
 
 
 46
 The Logan Court made it clear that each of the above elements must be established if avoidance is to be defeated. Addressing the difference between subsections (B) and (C), the Court stated:
 
 
 47
 In using the conjunctive "and" between subsections (B) and (C)--rather than the disjunctive "or"--Congress clearly intended to establish separate, discrete, and independent requirements which a creditor would have to fulfill to prevent avoidance.
 
 
 48
 Id. at 243-44. Describing the components of subsections (B) and (C) as "subjective" and "objective" respectively, we held in Logan that:
 
 
 49
 The subjective prong (subsection (B)) requires proof that the debt and its payment are ordinary in relation to other business dealings between that creditor and that debtor. The objective prong (subsection (C)) requires proof that the payment is ordinary in relation to the standards prevailing in the relevant industry.
 
 
 50
 Id. at 244 (emphasis in original). This holding is entirely consistent with the approach followed in Yurika. There, noting that "industry practices are directly implicated," we tested the payments at issue against both the ordinary course of dealings between the parties and the ordinary practices in the industry as a whole. Yurika, 888 F.2d at 45.
 
 
 51
 As the Yurika Court observed, "[t]he Fulghum court did acknowledge that courts 'might' be required to examine the industry standards in addition to the parties' prior dealings." Id. In fact, the Fulghum Court stated that [c]onsideration of the practices of the parties might not conclude the Sec. 547(c)(2) analysis; industry practice might be relevant to the Sec. 547(c)(2)(C) element of 'ordinary business terms.' " Fulghum, 872 F.2d at 743, n. 5. The Fulghum Court went on to note that there was no record evidence to indicate that industry practice differed from the practice of the parties and that the record disclosed, in at least one respect, that what the parties were doing was a "common practice." Id. In Fulghum, moreover, the parties were in agreement that " 'ordinary' contemplates what is ordinary with respect to the parties." Id. Thus, it seems that the issue decided in Logan was simply not presented for decision in Fulghum.
 
 
 52
 For the reasons stated above, we do not read Logan as departing from either Yurika or Fulghum. Accordingly, we reverse the district court's decision overruling the bankruptcy court's findings as to which lease payments were avoidable under Sec. 547(c)(2)(C).
 
 III.
 
 53
 Relying on the Supreme Court's recent decision in Barnhill v. Johnson, --- U.S. ----, 112 S.Ct. 1386 (1992), Still contends that the district court erred in affirming the bankruptcy court's decision regarding the date which constitutes a "transfer" under Sec. 547(c)(2). The bankruptcy court held that the dates on which Fruehauf received payments from Southwest, rather than the dates on which the checks cleared Southwest's bank account, are the relevant dates for determining when a "transfer" occurred under Sec. 547(c)(2).
 
 
 54
 In Barnhill, the Court held that under Sec. 547(b) a "transfer" made by check occurs "on the date when the drawee bank honors it" rather than "on the date the check is presented to the recipient." Barnhill, 112 S.Ct. at 1388. The Barnhill Court specifically distinguished Sec. 547(b) from Sec. 547(c), noting that Courts of Appeals have unanimously held that under Sec. 547(c) a "transfer" is determined based on the date when the payment is delivered. Id. at 1391. Noting the different purposes of Sec. 547(c) and Sec. 547(b), the Court refused to adopt the "date of delivery" rule for Sec. 547(b). Id. Accordingly, we find no error in the district court's decision affirming the bankruptcy court's ruling that the date on which Fruehauf received checks from Southwest is the date which constitutes a transfer under Sec. 547(c).
 
 IV.
 
 55
 Finally, Still contends that the district court erred in affirming the bankruptcy court's decision that the lease agreement between Southwest and Fruehauf was a true lease and not an installment sales contract. The district court explained that "if the lease were a true lease, the obligation to make the lease payments did not arise until the date the rent was due, and any avoidable lease payments would entitle Fruehauf to credit for 'new value.' " (District Court Order at 4). Fruehauf claims it is entitled to new value credit pursuant to Sec. 547(c)(4), for lease payments avoided by Southwest as preferential transfers under Sec. 547(b).[1]
 
 
 56
 In Consumer Lease Network v. Puckett (In re Puckett), 60 B.R. 223, 235-239 (Bankr.M.D.Tenn.1986), aff'd, 838 F.2d 470 (6th Cir.1992), the bankruptcy court listed 14 factors that courts often consider in determining when a lease is a true lease. In its memorandum decision, the bankruptcy court listed these factors and applied them to the facts of the present case, noting that "the lease transaction in the instant case contains characteristics typically found in both an installment sales contract and a true lease." (Bankruptcy Court Memorandum at 13-14). The court concluded that the lease between Southwest and Fruehauf was a true lease, explaining its ruling as follows:
 
 
 57
 In the instant case, Southwest was not obligated or "economically compelled" to purchase the trailers at the end of the lease term. The terms of the lease gave Southwest the option to purchase the trailers for fair market value and the evidence indicates the fair market value of the trailers at the conclusion of the lease term would not have been negligible since the trailers would still have had a useful life of three to five years and a residual value of $5,600 per trailer. Although each side can legitimately claim a number of the Puckett factors support their respective positions concerning the character of the lease in this case, the fact that the purchase option was not nominal and Southwest was not "economically compelled" to purchase the trailers at the expiration of the lease tips the scales in favor of a conclusion that the lease was a true lease.
 
 
 58
 (Bankruptcy Court Memorandum at 17-18). The bankruptcy court correctly applied the law and adequately considered the facts in reaching its conclusion that the lease agreement between Southwest and Fruehauf is a true lease and not an installment sales contract. Accordingly, we find no error in the district court's decision affirming the bankruptcy court's ruling.
 
 V.
 
 59
 For the foregoing reasons, we AFFIRM in part and REVERSE in part, and REMAND this case for a judgment to be entered consistent with the bankruptcy court's memorandum decision of March 7, 1991.
 
 
 
 [1]
 Section 547(c)(4) reads as follows:
 (c) The trustee may not avoid under this section a transfer--
 (4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor--
 (A) not secured by an otherwise unavoidable security interest; and
 (B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor.
 11 U.S.C. Sec. 547(c)(4) (West 1979) (emphasis added). The bankruptcy court found that Fruehauf was entitled to new value credit of $7.40 per day, "since the trailers were being leased at the rates under the long-term lease agreement between Fruehauf and Southwest and not at rates for short-term usage." (Bankruptcy Court Memorandum at 29).